[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 6, 2005
THOMAS K. KAHN
CLERK

No. 04-15884
Non-Argument Calendar

_____

BIA Nos. A95-225-699 & A95-225-700

TALIM SULAMAN,

Petitioner-Appellant,

versus

U.S. ATTORNEY GENERAL,

Respondent-Appellee.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

**(September 6, 2005)**

Before ANDERSON, BIRCH and MARCUS, Circuit Judges.

PER CURIAM:

Talim Sulaman, through counsel, petitions us for review of the Bureau of Immigration Affairs' ("BIA") adoption and affirmance of the Immigration Judge's ("IJ") order denying his petition for asylum and withholding of removal under the Immigration and Nationality Act ("INA") and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). We **DENY** Sulaman's **PETITION**.

## I. BACKGROUND

Sulaman is a native and citizen of South Africa but is of Indian descent. On 1 August 2001, Sulaman, his wife Shereen, and their four children, Muhammed Waseen, Sumehyah, Muhammed Safwaan, and Aalia, were admitted to the United States as non-immigrant visitors with authorization to remain until 31 January 2002. On 29 March 2002, the Immigration and Naturalization Service[1] ("INS") issued all of the petitioners notices to appear, charging them with removability under the INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for remaining in the United States for a time longer than permitted. On 23 January 2002, Sulaman filed an application for asylum, withholding of removal, and CAT relief.

---

[1] On 25 November 2002, President Bush signed into law the Homeland Security Act of 2002 ("HSA"). Pub. L. No. 107-296, 116 Stat. 2135. The HSA abolished the INS and transferred its functions to a new Department of Homeland Security ("DHS"). This opinion refers to the agency as the INS because the case was initiated while the INS was still in existence.

2

In his application and testimony before the IJ, Sulaman claimed that he and his family had suffered past persecution because they are of Indian descent.[2] In support of his claim, he recounted four specific incidents of alleged persecution, all of which occurred after he and his family relocated from Durban to Phuthadit Jhaba[3] sometime in 1995 or 1996.[4] First, in December 2000, a group of blacks approached Sulaman and his family while they were at the beach. The group threatened to kill him and his family and then robbed them. They said it was time for them to go "back to India" and called them "mongrel dogs," an epithet for people of Indian descent. Second, in June or July of 2001, Sulaman was robbed by a different group of black people. Third, Sulaman's children were targeted by other children at school because they were wealthy. His children were beaten by "mainly black children" two or three times weekly if they did not give them money, their book bags and lunches were stolen, and they suffered daily verbal abuse. According to Sulaman, the bullies attacked only other Indian children, and

_____

[2] According to Sulaman's testimony, "blacks," "whites," and "Indians" are the primary racial groups in South Africa. Id. at 162. Throughout his testimony, Sulaman used the terms "coloreds" and "Indians" interchangeably to refer to South Africans of Indian descent. For consistency, we refer to the group as "Indians" throughout this opinion.

[3] According to Sulaman's testimony, Phuthadit Jhaba was called "Qwa Qwa" before 1994. Although Sulaman at some points referred to the city as Qwa Qwa, we refer to the city as Phuthadit Jhaba thoughout this opinion.

[4] Sulaman testified that he and his family moved from Durban in order to improve his business and also because of racial tensions between blacks and Indians there.

any complaints made to the school were ignored. Fourth, in March 2001, three black men visited Sulaman's factory when he was away and spoke to his wife. They asked why she was married to an Indian and offered to kill Sulaman to get him "out of the way" so that she could marry them. Sulaman believed that these men would kill his entire family if they came back. Neither Sulaman nor his wife saw these men again before they left the country, and Sulaman did not know their names and had never seen them before the incident.

Sulaman never reported these incidents to the police because he believed that they would be unresponsive to his complaints because he is Indian and the police are black. Sulaman fears that, if he and his family return to South African, black people would kill his family and kidnap and rape his wife and daughters because the circumstances in South Africa were worsening. Although Sulaman and his family have never been arrested or detained in South Africa, he also would fear the government and the police.

Additionally, Sulaman testified about racial and ethnic tensions in South Africa generally. Prior to 1994, Indians were discriminated against by whites on account of their race. Since the end of apartheid, Indians were discriminated against by blacks.[5] Sulaman believes that authorities will not protect his family

---

[5] In his application, Sulaman stated that black South Africans have a "racially motivated 'Pay Back' mentality" and believe that Indians and other non-black minority groups do not have the right to be in South Africa.

because they are part of the Indian minority. Because of the lack of police protection, many Indians have formed vigilante groups, such as the People Against Gangsterism and Drugs ("PAGAD"), as a way to protect themselves.

Sulaman's wife also testified before the IJ. She recounted, among other things, an incident in which her nephew was carjacked by blacks carrying AK-47 assault rifles. The police were called, and they chased the assailants and eventually killed them in a shootout.

The IJ also reviewed the U.S. State Department's South Africa Country Reports on Human Rights Practices for 2002 ("2002 Country Report" or "Report"). The 2002 Country Report noted continued incidents of "vigilante action and mob justice" throughout South Africa and stated that a recent study attributed the continuation to "police inefficiency and the perception that courts failed to deliver justice." Additionally, the 2002 Country Report indicated that there was widespread concern among white farmers that they would be targeted for political and racial reasons, but according to police and academic studies, the perpetrators were "usually common criminals motivated by financial gain." Id. at 281-82. A 2002 study showed that the government failed to protect the inhabitants of commercial farms in general, and that black women farm residents were especially vulnerable. The 2002 Country Report also noted that the government had banned from the nation's airwaves a song considered to be racist and anti-

5

Indian. In the section discussing discrimination against national, racial, or ethnic minorities, the Report made no mention of Indians suffering at the hands of blacks and instead noted that blacks, as well as other "previously disadvantaged groups," were still underrepresented in managerial and professional positions within the workforce.[6] Id. at 299.

The IJ denied Sulaman's application for asylum, withholding of removal, and CAT relief. After summarizing the evidence presented by Sulaman, the IJ made the following specific findings: (1) Sulaman's claim that the authorities will not protect his family was undermined by his wife's testimony that the police responded when her nephew carjacked and ultimately killed the perpetrators; (2) there was evidence that the South African government is making efforts to ensure that "there is no . . . racism against those of Indian descent," id. at 118, such as its banning a song perceived to be anti-Indian; (3) Sulaman and his family were victims of crimes, or, in some instances were perhaps verbally harassed because of their ethnicity, but there was no evidence which indicated that they were being persecuted on account of race; and (4) there was evidence that the difficulties encountered by Sulaman and his family began only after they moved to Phuthadit

---

[6]Sulaman submitted various other supporting documentation to the IJ.

Jhaba, and that there was no evidence of a threat of persecution on a country-wide basis.

Based on the background materials presented, the IJ also took note of the difficulties which plague South Africa as it makes its transition from the previous apartheid government to its current multiparty parliamentary democracy. The IJ noted that the country suffers from a "certain amount of lawlessness," id. at 117, is rife with racial tensions between whites and blacks, and has seen episodes of vigilante justice. However, the IJ found that the background materials did not indicate that individuals of Indian descent are being targeted specifically. The IJ also noted that Sulaman talked only in general terms of discrimination against Indians by blacks.

The IJ found that Sulaman failed to show past persecution or a well-founded fear of future persecution and that he failed to meet his burden of proving that "anyone in South Africa is interested in [him] due to any of the five enumerated grounds necessary for a grant of asylum." Id. at 119. Because Sulaman did not prove he was entitled to asylum, the IJ found that Sulaman also did not establish that he would "more likely than not" experience persecution on account of race, as required to obtain withholding of removal relief. Id. at 121. Finally, the IJ concluded that Sulaman was not eligible for CAT relief. Id. Accordingly, the IJ ordered Sulaman, his wife, and his children removed from the United States.

7

Sulaman appealed the IJ's decision to the BIA.  In a per curiam opinion, the BIA adopted and affirmed the IJ's decision.  First, the BIA concurred with the IJ's conclusion that the "harm to the respondents constitutes discrimination and harassment, but not persecution." Id. at 3.  Second, the BIA noted that Sulaman was not "detained, harmed, or threatened by the government on account of a protected ground." Id.  Finally, the BIA concluded that Sulaman could not show that the government was unwilling or unable to control the alleged persecutors because he failed to request police aid.

## II.  DISCUSSION

On appeal, Sulaman advances four main arguments.  First, he contends that he proved that he has a well-founded fear of future prosecution because (1) his testimony established a reasonable possibility of persecution on account of race, and (2) his testimony and information contained in the 2002 Country Report showed that the government is unable or unwilling to stop racially motivated persecution.  Second, Sulaman argues that the substantial weight of the evidence demonstrated that he was persecuted on account of his race because he and his family were "unprotected racial minorities in a country with an unparalleled history of violent racial persecution."  Opening Brief of Petitioner Talim Sulaman

8

at 51-52. Third and fourth, Sulaman avers that substantial evidence supports a finding that he was entitled to withholding of removal and/or CAT relief.[7]

We review the BIA's factual determinations under the substantial evidence test, and we "must affirm the BIA's decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (citation omitted). Because the substantial evidence standard is highly deferential, we can reverse the BIA's decision "only if the evidence 'compels' a reasonable fact finder to find otherwise." Sepulveda v. United States Att'y Gen, 401 F.3d 1226, 1230 (11th Cir. 2005) (per curiam) (citation omitted). We review de novo to the extent that the ruling is based on the interpretation of applicable statutes. Mazariegos v. United States Att'y Gen., 241 F.3d 1320, 1324 (11th Cir. 2001). Although we normally review the BIA's decision only, if the BIA expressly adopted the reasoning of the IJ, as it did in this case, we review the IJ's decision as well. Al Najjar, 257 F.3d at 1284.

A. Asylum

_____

[7]As Sulaman's removal proceedings were commenced after 1 April 1997, the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ("IIRIRA"), his case is governed by the permanent provisions of the INA, as amended by IIRIRA. Gonzalez-Oropeza v. United States Att'y Gen., 321 F.3d 1331, 1332 (11th Cir. 2003) (per curiam).

An alien who arrives in or is present in the United States may apply for asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is

> any person who is outside of any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of **persecution or a well-founded fear of persecution on account of race**, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A) (emphasis added). The asylum applicant carries the burden of proving statutory "refugee" status. See Al-Najjar, 257 F.3d at 1284. To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al-Najjar, 257 F.3d at 1287.

Although the INA does not explicitly define "persecution," we have recognized that "[n]ot all exceptional treatment is persecution," Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000), that "persecution . . . requir[es] more than a few isolated incidents of verbal harassment or intimidation," Sepulveda, 401 F.3d at 1231 (internal quotations omitted), and that "[m]ere harassment does not amount

10

to persecution," id. (internal quotations omitted). An alien's fear of future persecution generally must be based on an individualized risk of persecution. See 8 C.F.R. § 208.13(b)(2)(i). However, he need not show that he will be singled out for future persecution if he demonstrates a pattern or practice of persecution of people who are similarly situated. Id. at (b)(2)(iii).

In this case, we conclude that substantial evidence supports the IJ and BIA's conclusion that Sulaman did not suffer from past persecution. While Sulaman's testimony revealed that he and his family were robbed, his wife threatened, and his children bullied, these incidents, while certainly unpalatable, do not constitute persecution because they do not "rise above unpleasantness, harassment, and even basic suffering." See Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000). As for Sulaman's claim that he has a well-founded fear of future persecution, we again believe that substantial evidence supports the IJ and BIA's conclusions. Sulaman offered no particularized instances of violence aimed specifically at Indians nor evidence that, if he were to relocate to another part of South Africa, he and his family would still be targeted. Moreover, although the country conditions information contained in the record reflects that South Africa is still plagued by widespread racial tensions, it does not compel the conclusion that Sulaman will be persecuted on account of a protected ground upon his return or that there is a pattern or practice of persecution of Indians in the country. To the contrary, the

record contains evidence of South African government's intervention when an anti-Indian song was broadcast as well as evidence of police protection in cases of violence directed towards Indians. Thus, the IJ and BIA did not err in concluding that there was no substantial evidence to satisfy the objective and subjective components of the well-founded fear of future persecution requirement.

B.      Withholding of Removal

An alien who seeks withholding of removal under the INA must demonstrate that his "life or freedom would be threatened in [the country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); accord Mendoza v. United States Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). The alien must show that he "more-likely-than-not would be persecuted or tortured upon his return" to his country. Mendoza, 327 F.3d at 1287. The standard for withholding removal is more stringent than the "well-founded fear" standard for asylum, and an applicant unable to meet the "well-founded fear" standard for asylum is usually unable to qualify for withholding of removal. See D-Muhumed v. United States Att'y Gen., 388 F.3d 814, 819 (11th Cir. 2004).

In this case, Sulaman failed to meet the lower burden required to establish a "well-founded" fear of future persecution in South Africa. Accordingly, he cannot

12

meet the higher withholding of removal standard. We affirm the BIA's denial of Sulaman's application for withholding of removal.

C.    CAT Relief

To obtain withholding of removal under the CAT's implementing regulations, an alien must establish that he "more likely than not" will be tortured upon return to his home country. 8 C.F.R. § 208.16(c)(2). "Torture" is defined as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

Id. § 208.18(a)(1). Because applicants seeking CAT relief must meet a higher burden of proof than applicants seeking asylum, those who cannot prove a "well-founded fear" to obtain asylum usually cannot prove entitlement to relief under CAT. See Al Najjar, 257 F.3d at 1303.

In this case, Sulaman failed to demonstrate a "well founded fear" of future persecution upon return to South Africa. It thus follows that Sulaman failed to show that it was more likely than not he would be tortured on account of a protected factor. Accordingly, the IJ and BIA did not err in denying Sulaman CAT relief.

13

### III. CONCLUSION

Upon review of the record and the contentions of the parties, we conclude that substantial evidence supports the BIA's denial of Sulaman's application for asylum, withholding of removal, and CAT relief.  Accordingly, we **DENY** Sulaman's **PETITION**.